

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
04/12/2010

| | | |
|---|---|---|
| IN RE: | § | |
| **LEONIDAS KAPETANAKIS,** | § | **Case No. 08-32002** |
| Debtor. | § | |
| | § | **Chapter 7** |
| | § | |
| **FIRST NATIONAL INSURANCE** | § | |
| **COMPANY OF AMERICA,** | § | |
| Plaintiff | § | |
| | § | |
| **VS.** | § | **Adversary No. 08-03237** |
| | § | |
| **LEONIDAS KAPETANAKIS,** | § | |
| Defendant. | § | **Judge Isgur** |

<u>**MEMORANDUM OPINION**</u>

First National Insurance Company of America seeks a determination that its $3,050,000 Consent Judgment against Leonidas Kapetanakis is excepted from Kapetanakis's bankruptcy discharge.  Because the claim that forms the basis of the Consent Judgment resulted from Kapetanakis's fraudulent delivery of a forged document, the Consent Judgment is excepted from discharge.

On May 3, 2000, Kapetanakis forged the signatures of three of his relatives on an indemnity agreement (the "Indemnity Agreement") issued in favor of First National.  But for the delivery of the Indemnity Agreement, First National would not have issued surety bonds on behalf of Quality Woodworks, Inc., ("Quality"), a company owned by Kapetanakis's family.  First National suffered substantial losses on the surety bonds.  Those losses—caused by Kapetanakis's fraudulent execution of the Indemnity Agreement—are excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**Jurisdiction**

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

**Background**

**1.  General Information**

Kapetanakis and his brother, Chris Kapetanakis, were shareholders in Quality, a family business founded by Kapetanakis's father.  Kapetanakis was Quality's president.

Quality specialized in high quality woodworking for construction projects.  Much of Quality's work was performed for governmental projects, such as courthouses or public arenas. In order to be selected for a project under the industry's competitive bidding process, Quality normally provided a surety bond that assured (i) the payment of subcontractors and material suppliers; and, (ii) Quality's performance according to its construction contracts.  Kapetanakis was responsible for obtaining such surety bonds on Quality's behalf.

Over a ten-year period, Quality regularly obtained its surety bonds through Richard Heidbrink.  During that time, Heidbrink worked for various employers who provided surety bond services to Quality.  In May, 2000, Heidbrink was an employee of Guaranty Insurance Services. Guaranty served as an agent for various surety bond providers, including First National.

On May 2, 2000, Heidbrink introduced Kapetanakis to Frank Zebedeo, an underwriter employed by First National.  The purpose of the introduction was to determine whether the parties would agree to a bonding arrangement between First National and Quality.

On May 3, 2000, Heidbrink presented Quality with the subject Indemnity Agreement that had been prepared by Zebedeo.  The Indemnity Agreement contained a signature block based on

information Heidbrink had provided to Zebedeo regarding Quality's ownership structure. The signature block required four signatories: Kapetanakis, individually and as President of Quality; Chris Kapetanakis, individually and as Secretary of Quality; D. Sue Kapetanakis, individually; and Paola Kapetanakis, individually. Sue Kapetanakis was married to Kapetanakis; Paola Kapetanakis was married to Chris Kapetanakis.

## 2.  The Execution of the Indemnity Agreement

Kapetanakis admits that he forged the signatures of Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis on the Indemnity Agreement on May 3, 2000. The admission was made during the course of the lawsuit that culminated with the Consent Judgment.

In this case, the Court must determine whether Kapetanakis's forgery constitutes non-dischargeable fraud. In determining what occurred on May 3, 2000, the Court has considered both direct testimony and circumstantial evidence. This task was made more difficult because a key witness—Heidbrink—died in 2004. Nevertheless, the Court concludes that Kapetanakis committed the forgery for the purpose of defrauding First National.

However, to understand the nature of the dispute, it is imperative to explain Kapetanakis's version of the events that occurred on May 3, 2000.

According to Kapetanakis, Heidbrink presented the Indemnity Agreement for execution during a meeting on May 3, 2000. Kapetanakis alleges that he left Heidbrink in his office and walked to the office of Marilynn Mitteldorf, a notary public employed by Quality. Kapetanakis claims that he signed only his own name on the Indemnity Agreement and that his signature was notarized by Mitteldorf.

Mitteldorf confirms Kapetanakis's story. However, when Mitteldorf notarized the document, she signed a notarization that stated that she had witnessed the signatures of all four

members of the Kapetanakis family.  Mitteldorf claims that this was an oversight and that she only intended to notarize Kapetanakis's signature.

There is no dispute that Mitteldorf did not witness the signing of the Indemnity Agreement by the other three signatories.  Although the Court questions Mitteldorf's veracity, the Court does not and cannot conclude whether Mitteldorf's notarization of the additional signatures was an intentional or an accidental error.

After Kapetanakis left Mitteldorf's office, Kapetanakis returned to his office to resume his meeting with Heidbrink.  Kapetanakis alleges that he told Heidbrink that Chris Kapetanakis, Sue Kapetanakis, and Paola Kapetanakis would not sign the Indemnity Agreement unless their liability on the indemnity was restricted to their ownership shares in Quality.  According to Kapetanakis, Heidbrink responded by explaining that First National was ready to move forward with the bonding arrangement.  Heidbrink allegedly then suggested that Kapetanakis forge the signatures of the other three indemnitors.  Therefore, according to Kapetanakis, it was with Heidbrink's knowledge and upon Heidbrink's suggestion that Kapetanakis forged the other signatures.

Although Kapetanakis's version of events portrays Heidbrink as a co-conspirator in the forged execution of a multi-million dollar Indemnity Agreement, Kapetanakis testified that he trusted Heidbrink and therefore followed Heidbrink's advice.  Kapetanakis's version of events includes a statement allegedly made by Heidbrink that Heidbrink would negotiate a revised arrangement in the near future that would obviate any forgery.

Kapetanakis asks the Court to believe that Kapetanakis believed that Heidbrink's alleged suggestion of forgery was consistent with his duties as First National's agent.  But, if that were the case, there would be no reason to commit any deception with respect to the signatures.

4

The Court is unpersuaded by Kapetanakis's explanation of the execution of the Indemnity Agreement and finds that the circumstances surrounding its execution tell a different tale. Deception abounded.

The signatures of the other three indemnitors were written in a different cursive style than Kapetanakis's own cursive style—and were each written in a different cursive style than one another. The Court notes that each signature included the name "Kapetanakis" and that the name "Kapetanakis" was written in a different cursive style on each of the signatures.

The forged signatures were also written in different ink colors with different pens. When asked to testify as to why he used multiple ink colors if he had not intended to deceive First National, Kapetanakis gave no meaningful explanation. Notably, Kapetanakis did not claim that Heidbrink encouraged the use of different pens or writing styles.

Why use different penmanship and different colors of ink? The Court finds that Kapetanakis wanted to conceal the forgery and deceive First National and Heidbrink into believing that the signatures of the other three indemnitors were authentic.

Heidbrink's alleged participation in the scheme is also belied by Kapetanakis's previous forgery of the same signatures.

The evidence is unambiguous that Kapetanakis had previously forged the signatures of Chris Kapetanakis, Sue Kapetanakis, and Paola Kapetanakis on another indemnity agreement. The prior forged agreement was with Merchants Bonding Company. The events with Merchants Bonding Company preceded any relationship with First National. Although there is no evidence that the Merchants Bonding Company agreement was ever delivered, the Court finds it extraordinary that Kapetanakis would have previously committed the same forgery on another indemnity agreement.

There is no evidence that Heidbrink encouraged the prior forgery.  Yet, Kapetanakis asks this Court to believe that it is an innocent (or not so innocent) coincidence that the same forgery on the same type of document was independently suggested by Heidbrink.  This Court declines to engage in such fanciful gullibility.

**3.   First National Bonds**

After the forgery of the Indemnity Agreement, First National issued multiple surety bonds on Quality's behalf.  Four of those bonds resulted in losses that are covered by the Consent Judgment.  The losses arose from Quality's failure to fulfill its bid requirements, its performance obligations, and/or its payment obligations as required under its contracts on four projects:  the Galveston County Justice Center, the Tarrant County Family Law Center, Tomball College, and the Virginia Hospital Center.[1]  All four surety bonds were issued on application by Quality and pursuant to a master bonding agreement between Quality and First National, which included the partially forged Indemnity Agreement.

Heidbrink remained Kapetanakis's contact person for questions that arose with respect to the various bonds.  For instance, Kapetanakis would call Heidbrink for assistance on any claims filed against bonds issued on behalf of Quality.  Heidbrink's assistance included investigating claims, responding to claim notices, and generally monitoring and following-up on claims-related correspondence.  After Heidbrink died in the summer of 2004, Kimberly Smith, Heidbrink's co-worker at Guaranty, became responsible for Quality's account.

In December, 2004, First National severed its bonding relationship with Quality.  First National cited Quality's lack of working capital and lack of net worth as the reasons for termination.

---

[1] The Tarrant County and Tomball College bonds were issued in 2003, while the Galveston and Virginia bonds were issued in 2004.

**4.  The Consent Judgment**

In the underlying lawsuit, which culminated with the Consent Judgment, First National sued Kapetanakis; his wife, D. Sue Kapetanakis; his brother, Chris Kapetanakis; and his sister-in-law, Paolo Kapetanakis for breach of contract based on their failures to indemnify losses on the four surety bonds referenced above.

During the underlying lawsuit, Kapetanakis admitted to forging the signatures of Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis on the Indemnity Agreement.  As a result of the admission, (i) Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis were absolved of liability in the federal court lawsuit; and (ii) Kapetanakis agreed to the Consent Judgment.

### First National's Theory of the Case

First National asserts that it relied on the forged signatures when it began issuing bonds for Quality.  Without the signatures, First National alleges that it would not have issued the four surety bonds on which it sustained losses.  First National argues that because the signatures of the three indemnitors were forged, the Consent Judgment should be excepted from discharge.  First National alleges that the forgeries constitute false pretenses, false representations, and/or actual fraud that fall within the discharge exception set forth in 11 U.S.C. § 523(a)(2)(A).

### Trial Rulings

The Court conducted trial over the course of four days, from October 5, 2009 to October 7, 2009, and on February 17, 2010.  Before the Court heard opening arguments on the first day of trial, the Court granted Kapetanakis's motion and disallowed First National's request for legal fees and costs.  The Court ruled that First National was not entitled to any legal fees and costs, even if it prevailed.

First National alleges that it was entitled to legal fees and costs under the terms of the underlying Indemnity Agreement.  Although the Court looks to the foundation of the debt (i.e., the Indemnity Agreement) for determining whether the debt is excepted from discharge, the Court looks to the Consent Judgment to determine the amount of the debt.  *See Archer v. Warner*, 538 U.S. 314, 316 (2003); *In re Luce*, 960 F.2d 1277, 1285 (5th Cir. 1992) (holding that legal fees and costs may also be nondischargeable with the underlying debt if they are provided by state statutory or contractual grounds); *Alport v. Ritter*, 144 F.3d 1163, 1168 (8th Cir. 1998) (referring to the base contract to determine whether legal fees may be included in a nondischargeable debt under § 523(a)(2)(A)).  The Consent Judgment arose from the parties' July 23, 2007 compromise and settlement agreement, which resolved all debts due under the Indemnity Agreement.  Therefore, the Consent Judgment is the relevant document to determine the amount of the debt as well as the award of any legal fees and costs.  Because the Consent Judgment contains no provision for legal fees and costs, those cannot be awarded to First National.

On the third day of trial on October 7, 2009, after First National rested its case in chief, Kapetanakis moved for a verdict on partial findings pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  The Court denied the motion, but invited the parties to submit post-trial briefs with respect to the issues identified by Kapetanakis.  The parties have submitted a total of six briefs, three by each side (docket nos. 74, 75, 99, 110, 111, 112).

### Exception to Discharge for Actual Fraud Under § 523(a)(2)(A)

Section 523(a)(2)(A) of Title 11 provides that "[a] discharge under [chapter 7] does not discharge an individual from any debt . . . for money, property, services . . . or credit . . . to the extent obtained, by . . . false pretenses, a false representation, or actual fraud  . . . ."  11 U.S.C.

§ 523(a)(2)(A).  The Supreme Court has held that this language "cover[s] a debt embodied in a settlement agreement that settled a creditor's earlier claim" for money, property, services or credit obtained by fraud.  *Archer v. Warner*, 538 U.S. at 316.

The Fifth Circuit has made a distinction "between actual fraud on the one hand, and false pretenses and representations on the other."  *Recoveredge, L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).  False representation or false pretense requires a different showing than actual fraud.  *Id.* at 1292-93.  Although First National pleads theories of false pretenses, false representations, and/or actual fraud in its Complaint, its trial arguments and briefs focused on actual fraud.  Because the Court finds that actual fraud occurred, it need not evaluate the alternative bases for relief.

"'Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct or active operation of the mind, used to circumvent and cheat another—something said, done, or omitted with the design of perpetrating what is known to be cheat or deception.'"  *Id.* at 1293 (quoting 3 COLLIER ON BANKRUPTCY P. 523.08[5], at 523-57 to 523-58 (footnote omitted)).  To prove actual fraud, an objecting creditor must prove, by a preponderance of the evidence, that:  (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on such representations;[2] and (5) the creditor sustained losses as a proximate result of the representations.  *Id.*; *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

---

[2] Though some courts require the creditor to have "reasonably relied" on the representations, the Fifth Circuit does not.  *Allison v. Roberts* (*In re Allison*), 960 F.2d 481, 485 (5th Cir. 1992).  Instead, the Fifth Circuit requires actual reliance, with "the reasonableness of reliance [as] strong circumstantial evidence in the factual determination regarding actual reliance."  *Id.*

### 1.  The Debtor Made Representations

The signatures of Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis on the Indemnity Agreement are the representations at issue.  There is no dispute that Kapetanakis signed on their behalf.  Kapetanakis testified and admitted that he forged their signatures. Therefore, First National has met its burden of proof with respect to the first element.

### 2.  At the Time the Representations Were Made, the Debtor Knew They Were False

Kapetanakis testified and admitted that he forged the signatures of Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis on the Indemnity Agreement without their authorization.  First National has met its burden of proof with respect to the second element.

### 3.  The Debtor Made the Representations with the Intention and Purpose to Deceive the Creditor

The third element is the scienter requirement.  As the Fifth Circuit has stated, "debts obtained by frauds involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made."  *Gen. Elec. Capital Corp. v. Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).

> An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation."  Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive.  Thus, a "dumb but honest" defendant does not have scienter.

*Id.* (internal citations omitted).

The Court finds that Kapetanakis possessed the requisite intent to deceive First National in forging the signatures of the other three indemnitors.  First, Kapetanakis admitted that he forged the signatures without authorization.  Second, Kapetanakis testified that Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis would never have agreed to indemnify

any bonding company according to the terms of the Indemnity Agreement as written. Kapetanakis believed that his brother and the two spouses would only sign an indemnity agreement if the indemnity were limited to the value of their ownership shares in Quality.  The Indemnity Agreement with the forged signatures contains no such limitations.  Third, the forged signatures on the Indemnity Agreement were written in different ink colors by different pens. Kapetanakis wanted to conceal the forgery and deceive First National into believing that the signatures of the other three indemnitors were authentic.  Fourth, the signatures of the other three indemnitors were written in a different cursive style than Kapetanakis's own cursive style—and the style of each signatory differed from the others.  The Court notes that each signature included the name "Kapetanakis" and that the name "Kapetanakis" was written in a different cursive style on each of the signatures.  Fifth, Kapetanakis knew all along that the signatures were false, and never held the belief that the signatures were somehow "true."

Moreover, as set forth in more detail above, the evidence is unambiguous that Kapetanakis had previously forged the signatures of Chris Kapetanakis, Sue Kapetanakis, and Paola Kapetanakis on another indemnity agreement with Merchants Bonding Company.  The Court finds it unbelievable that Kapetanakis committed the forgery on the Indemnity Agreement only at Heidbrink's behest when Kapetanakis was fully capable of independently committing the same type of forgery previously.

Kapetanakis argues that he did not possess the requisite intent to deceive First National. He alleges that Heidbrink suggested that Kapetanakis commit the forgery.

11

As an initial matter, the Court finds that Kapetanakis's testimony is not credible. The facts simply belie Kapetanakis's version of events. Accordingly, the Court finds that Kapetanakis's version of events did not occur.[3]

Heidbrink worked for Guaranty, the company through which Quality negotiated the bonding arrangement with First National. Heidbrink had a power of attorney to execute surety bonds on First National's behalf. Therefore, Heidbrink was First National's agent. Accordingly, Heidbrink's knowledge of the forgery might be imputed to First National as the principal. It is that prospective imputation that forms the basis of Kapetanakis's defense.

Heidbrink died during the summer of 2004; therefore, there is no one available to corroborate Kapetanakis's version of the facts. In fact, there is no other evidence to corroborate Kapetanakis's version of the facts. Instead, except for Kapetanakis's own testimony, all the evidence contradicts Kapetanakis's story. As discussed above, the facts show that Kapetanakis intended for First National to see the signatures as "true," with or without Heidbrink's cooperation in the forgery. The Court does not believe Kapetanakis's story.

---

[3] The Court notes that a portion of Kapetanakis's version of events is supported by Mitteldorf. However, even accepting that version of the facts as true, Kapetanakis still committed the forgery with fraudulent intent. Specifically, Kapetanakis's version of the facts is that after Heidbrink brought him the Indemnity Agreement on May 3, 2000, he signed the Indemnity Agreement individually and as President of Quality. He executed his signatures in front of Mitteldorf, the notary public. There is no dispute that Mitteldorf did not witness the execution of the other three indemnitors' signatures. Mitteldorf testified that she mistakenly executed the Individual and Corporate Acknowledgement blocks as a witness to not only Kapetanakis's own signatures, but also with respect to Chris Kapetanakis, Sue Kapetanakis, and Paola Kapetanakis's signatures. Mitteldorf testified that she should have crossed out the names of the other three indemnitors as they appeared on the acknowledgement blocks.

Whether Mitteldorf assisted Kapetanakis intentionally or accidentally, Kapetanakis knew that the notarization was false. In any event, even if the Court credits Mitteldorf's testimony, it fails to provide a defense. If the notarization was simply an error, then Kapetanakis took advantage of the error by adding the other signatures. If Mitteldorf participated in the scheme, the outcome was the same. Mitteldorf did not testify that she heard Heidbrink suggest the forgery or that she saw Kapetanakis commit the forgery. Her testimony—even if fully credited—leaves Kapetanakis as the forger who committed the fraud.

Assuming, *arguendo*, that Kapetanakis's story is true, the Court cannot find that Heidbrink's knowledge of the forgery should be imputed to First National.  In the unlikely event that Heidbrink participated in the fraud, he was acting adversely to his principal.

Generally, an agent's knowledge is imputed to his principal, unless the agent acts with an interest adverse to the principal.  *See Goldstein v. Union Nat'l Bank*, 213 S.W. 584, 591 (Tex. 1919).  The adverse interest exception applies when:

> [T]he agent's interests are so incompatible with the interests of his principal as practically to destroy the agency or to render it reasonably probable that an ordinary person, in the agent's position, under such circumstances, will neither act, [o]n behalf of his principal, upon his so acquired knowledge, nor disclose that knowledge to his principal, but because of such incompatibility in interests, will withhold such knowledge from the principal.

*Id.*

The Restatement (Third) of Agency § 5.04 explains that:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in at transaction or matter, intending to act solely for the agent's own purposes or those of another person.  Nevertheless, notice is imputed
>
> > (a)  when necessary to protect the rights of a third party who dealt with the principal in good faith; or
> >
> > (b)  when the principal has ratified or knowingly retained a benefit from the agent's action.
>
> A third party who deals with a principal through an agent, knowing or having reason to know that the agent acts adversely to the principal, does not deal in good faith for this purpose.

RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006).

Even if the Court were to presume the truth of Kapetanakis's story, the Court cannot impute Heidbrink's knowledge of the forgery to First National.  Any instruction by Heidbrink to Kapetanakis to forge the signatures of the other three indemnitors was against First National's

interests.  As discussed below, it was First National's policy to require indemnity not only from a corporation, but also from the corporation's owners and their spouses.  Any instruction by Heidbrink to forge the required signatures on the Indemnity Agreement was adverse to First National's interests.  Accordingly, the adverse interest exception applies and Kapetanakis's defense fails.

First National has met its burden of proof with respect to the third element.

### 4.  The Creditor Relied on the Representations

At trial, Zebedeo testified with respect to First National's reliance on the forged signatures.  He was called as a witness on two separate occasions, once for First National on October 6, 2009 and another time for Kapetanakis on February 17, 2010.  Before discussing the particularities of Zebedeo's testimony, the Court remarks that Zebedeo was a highly credible witness.  He answered questions directly without concern for how it would affect either party's case.

Since 1975, Zebedeo has worked as an underwriter in the surety bond industry.  He has worked for First National and its successors for over 10 years as an underwriting specialist.  Accordingly, Zebedeo is a qualified witness with respect to how bonds were issued by First National.

Zebedeo testified that before First National would issue any bonds on behalf of Quality, First National required a "fully executed" indemnity agreement to be in place to secure all projects.  The Indemnity Agreement would serve as the master application for all future bonds to be issued on behalf of Quality.  Once the fully executed Indemnity Agreement was in place, First National began issuing bonds on behalf of Quality.

According to Zebedo, a "fully executed" indemnity agreement meant that an indemnity agreement was signed by the company, and by the company's owners and their spouses.  In May 2000, based on information Zebedeo had received from Heidbrink regarding Quality's ownership structure, Zebedeo prepared the Indemnity Agreement.   The signature block on the Indemnity Agreement required the signature of Kapetanakis, Chris Kapetanakis, Sue Kapetanakis and Paolo Kapetanakis.

Kapetanakis disputes whether First National actually required indemnity by the spouses or whether Zebedeo mistakenly included the spouses as indemnitors.

Zebedeo's testimony with respect to whether First National required the signatures of the spouses on its Indemnity Agreement was vague the first time he testified on October 6, 2009. On October 6, 2009, Zebedeo testified that during his meeting with Kapetanakis and Heidbrink on May 2, 2000, he informed Kapetanakis of First National's indemnification requirements.  He then asked Kapetanakis whether indemnity was available.  Zebedeo testified that Kapetanakis told him indemnity was available.

Immediately after this line of questioning, there was confusion between the parties regarding whose indemnity was available.  As a result, the Court asked questions to clarify Zebedeo's testimony as follows:

> The Court:     Could you just repeat what you asked [Kapetanakis] that day [on May 2, 2000]?
>
> A:     I asked [Kapetanakis] if his indemnity was available.
>
> The Court:     If whose indemnity was available?
>
> . . . .
>
> A:     Corporation's and the owners'.

Tr. at 30 (docket no. 67).

As the transcript excerpt above shows, Zebedeo did not explicitly testify that he inquired about the availability of indemnity from the owners' spouses during the May 2, 2000 meeting. However, there is no real dispute that the individual indemnitors on the Indemnity Agreement included Sue Kapetanakis and Paola Kapetanakis as spouses.  This is demonstrated not only by the Indemnity Agreement itself, but also by Zebedeo's testimony on direct examination later that day as follows:

> Q:      This is the indemnity agreement, as you testified, for Quality Woodwork. The very first line of the document says:   "This agreement is made by the undersigned in favor of Safeco Insurance Companies for the purpose of indemnifying," et cetera.  Did I read that first part correctly?
>
> A:      Yes, sir.
>
> Q:      Okay.  And do you have an understanding of who the "undersigned" are on this document?
>
> A:      That would be the corporation and the personal indemnitors and spouses.
>
> Q:      People that signed the document.
>
> A:      Yes, sir.

Tr. at 56-57 (docket no. 67).

Despite the slight confusion caused by Zebedeo's vague testimony on October 6, 2009 regarding whether spousal indemnity was required, the Court concludes that First National routinely required the indemnity of both the owners and their spouses.  This finding is based largely on the credibility of Zebedeo as a witness.  As set forth above, Zebedeo answered questions directly without regard to how his answers might affect either party's case.  The fact that Zebedeo was vague in parts of his testimony does not discount his credibility.

Furthermore, as the transcript excerpt immediately above shows, Zebedeo understood that the individual indemnitors included the owners' spouses.  Zebedeo's belief, even if not

always explicitly stated, is buttressed by the fact that in May 2000, Zebedeo had assumed that Sue Kapetanakis and Paola Kapetanakis were not owners of Quality.  Therefore, their signatures on the Indemnity Agreement were the result of their spousal relationships to Kapetanakis and Chris Kapetanakis, respectively.

Finally, the second time Zebedeo testified on February 17, 2010, he clarified First National's indemnity requirements.  Zebedeo credibly testified that First National required the indemnity of the corporation, its owners and the spouses.  Zebedeo stated that spousal indemnity was required to cover community property interests.  Zebedeo further explained that when he originally testified on October 6, 2009 regarding First National's indemnity requirements, the word "owners," as he then used it, included the owners' spouses.  His understanding of the word "owners" was based on industry custom.

Kapetanakis argues that First National did not rely on the Indemnity Agreement to issue the bonds on behalf of Quality, but rather, relied on the financial strength of Quality.  It was also based on the lack of Quality's financial strength that First National ultimately stopped issuing bonds on behalf of Quality.

Kapetanakis's argument fails.  Though Zebedeo testified that First National pursued bonding projects with Quality in light of Quality's corporate financial strength, that fact is irrelevant to the question at hand.  The issue is whether Quality actually relied on the forged signatures on the Indemnity Agreement in issuing the four subject bonds.  *Allison*, 960 F.2d at 485 (holding that only actual reliance is required under 11 U.S.C. § 523(a)(2)(A)).  The Court finds that First National actually relied on the forged signatures.  As discussed above, Zebedeo testified that First National would not have issued the four subject bonds on behalf of Quality

17

without a "fully executed" indemnity agreement in place.  Therefore, First National satisfies its burden of proof with respect to the fourth element.

Moreover, First National's policy of requiring spousal signatures is rational and its reliance on the signatures was both actual and reasonable.  First National's business practice of requiring the spousal signatures alleviated any need for First National to investigate whether it had the signatures of all actual owners of the business.  It was not required to investigate whether the shares were, in actuality, community property.  First National would have protection in a divorce proceeding.  By requiring indemnity from the owners and the spouses, First National could also be assured that the family was committed to the success of the business.  All of these factors could have formed legitimate bases for First National's requirement and for its reliance on the signatures on the Indemnity Agreement.

**5.   The Creditor Sustained Losses as a Proximate Result of the Representations**

The fifth and final element of proximate causation flows from the requirement under § 523(a)(2)(A) that the non-dischargeabilty of debt is "to the extent *obtained by*" fraud.  11 U.S.C. § 523(a)(2) (emphasis provided); *Archer*, 538 U.S. at 325.  The creditor "must demonstrate that there is a causal nexus between the fraud and the debt."  *Archer*, 538 U.S. at 325.

> [The Supreme] Court has been less than clear with respect to the requirements for establishing proximate cause.  In the past, the Court has applied the term "'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."  The Court has explained that, "at bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'"  While the concept of proximate cause is somewhat amorphous, the common law is clear that certain intervening events – otherwise called "superseding causes" – are sufficient to sever the causal nexus and cut off all liability.

*Id.* at 326 (internal citations omitted).

There is no dispute that First National sustained losses as a result of the issuance of the four bonds.  Those losses resulted in the Consent Judgment.  The bonds were issued only after the Indemnity Agreement was "fully executed" – purportedly by all four indemnitors.  Therefore, First National's losses are directly traceable to Kapetanakis's forgery of three of the four indemnitors' signatures.  Kapetanakis's forgery proximately caused First National's losses.

Kapetanakis argues that the forged signatures of Chris Kapetanakis, Sue Kapetanakis, and Paolo Kapetanakis did not cause the losses because First National would have issued the bonds anyway.  Particularly, Kapetanakis argues that Chris Kapetanakis was no longer an owner of Quality in 2000, such that First National would not have required Paolo Kapetanakis or Chris Kapetanakis's signatures.  Therefore, all four subject bonds on which First National sustained losses would still have been issued.[4]  In other words, the termination of Chris Kapetanakis's ownership in Quality was an intervening event that severed causation.

Kapetanakis fails to consider the role of his wife's signature on the issuance of the bonds.  On the assumption that post-2000, First National no longer required Chris Kapetanakis and Paolo Kapetanakis's signatures on the Indemnity Agreement (because Chris Kapetanakis was no longer an owner of Quality), First National would have still required Sue Kapetanakis's signature as Kapetanakis's spouse.  Her signature was forged.  Therefore, the losses on the four subject bonds would still be the result of Kapetanakis's forgery.

Kapetanakis next asserts that First National would have sustained the same amount of losses regardless of the forged signatures because the personal net worth of the three signatories would not have covered the losses.

---

[4] First National has filed an Emergency Motion to Reopen for Additional Evidence (docket no. 102) to introduce evidence that Chris Kapetanakis remained an owner of Quality as late as 2004.  Because the Court finds that First National's reliance on Sue Kapetanakis's forged signature is dispositive, the Court need not consider when Chris Kapetanakis's ownership in Quality terminated.

It is true that First National did not seriously consider the financial wherewithal of any of the individual indemnitors.  Though First National required the financial information of the four individuals to be updated on a quarterly basis, it did not collect that information on a consistent basis and did not seriously review the information that it did collect.  In total, First National collected financial information on the individuals only three times over the more than four-year relationship with Quality.[5]  If First National had reviewed the financial information it had collected, it would have noticed that Chris and Paola Kapetanakis's financial information for March 2004 and June 2003 were identical.  Indeed, the June 2003 submission is an identical copy of the March 2004 submission, except that the date was changed.  Therefore, the Court concludes that the continued financial net worth of any individual indemnitor was irrelevant to First National's decision to issue bonds on behalf of Quality.  Rather, it was simply First National's policy to have indemnity from the owners and their spouses.  This policy did not include continuous inquiry with respect to the financial strength of any individual indemnitor.

The proper issue for the Court is whether First National would have issued the bonds and sustained the losses it did on the four subject bonds even without the forged signatures.  The answer is "no."  As discussed above, First National would not have issued any bonds on behalf of Quality unless a fully executed indemnity agreement was in place.  Therefore, without the forged signatures, First National would not have done business with Quality.

First National has met its burden of proof with respect to the fifth and final element.

---

[5] First National collected financial information on the individuals in November, 2002; March, 2004; and June, 2003.

**Conclusion**

First National has met its burden of proof under § 523(a)(2)(A).  Accordingly, the Court finds that Kapetanakis's $3,050,000.00 debt to First National is non-dischargeable.  A separate judgment will be issued.

SIGNED **April 12, 2010.**

_____

Marvin Isgur

UNITED STATES BANKRUPTCY JUDGE